1  Frank S. Hedin (SBN 291289)
   Hedin LLP
2  535 Mission Street, 14th Floor
   San Francisco, CA 94105
3  Telephone:  (305) 357-2107
   Facsimile:   (305) 200-8801
4  E-Mail:      fhedin@hedinllp.com

5  *Counsel for Plaintiffs and
   the Putative Class*

6  [Additional counsel on signature page]

7                UNITED STATES DISTRICT COURT

8                CENTRAL DISTRICT OF CALIFORNIA

9
   | SYLVIA CHANDRA AND DAMANY BROWNE, individually and on behalf of all others similarly situated, | Case No. 2:25-cv-03984-MCS-SK |
   | Plaintiffs, | **CLASS ACTION** |
   | v. | **DEMAND FOR JURY TRIAL** |
   | PRAGER UNIVERSITY FOUNDATION, | |
   | Defendant. | |

15
              **FIRST AMENDED CLASS ACTION COMPLAINT**
16

17

18

19

20

Plaintiffs, Sylvia Chandra and Damany Browne ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Prager University Foundation ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## **NATURE OF THE CASE**

1. Defendant Prager University Foundation ("Defendant") owns and operates its online and mobile applications ("Apps"), including prageru.com (the "Website"). Through its Website and Apps, Defendant creates videos and hosts a massive library of videos related to a number of topics, including but not limited to philosophy, education, politics, and religion. Further, Defendant also creates and hosts hundreds of educational and entertainment videos targeted specifically to kids, through its Prageru Kids brand, which it maintains on its Website.

2. Unbeknownst to Plaintiffs and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user or audiovisual content purchased —to unauthorized third parties without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

4. This Court has personal jurisdiction over Defendant because it is headquartered in this District. Defendant also conducts substantial business within California, including the sale, marketing, and advertisement of its Website, Apps, products and services.

5. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant is headquartered in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## PARTIES

6. Plaintiff Sylvia Chandra is a citizen of New York, who resides in Deer Park, New York. Plaintiff Sylvia Chandra has created an account with Defendant, by providing Defendant her email address and first and last name, and thereafter watched prerecorded videos on Defendant's Website within the last two years preceding the

filing of this Action.

7. By providing her email address or creating an account with Defendant, Plaintiff Chandra became a subscriber to Defendant's services and had an ongoing relationship with Defendant whereby Defendant would send her promotional emails concerning new video content and articles made available on the Website.

8. Throughout Plaintiff Chandra's interactions with Defendant's Website, Plaintiff Chandra has maintained and used Plaintiff's Facebook account, which publicly disclosed certain information about her, including but not limited to her name, picture, familial relationships, etc., from the same browser Plaintiff Chandra used to watch a prerecorded video from Defendant's Website.

9. Plaintiff Damany Browne is a citizen of New York who resides in Brooklyn, New York. Plaintiff Browne created an account with Defendant by providing Defendant his email address and first and last name. Plaintiff Browne used his account to watch prerecorded videos on Defendant's Website within the last two years preceding the filing of this Action.

10. By providing his email address and creating an account with Defendant, Plaintiff Browne became a subscriber to Defendant's services. As part of this relationship, Defendant would send emails to Defendant regarding new video content and articles made available on the Website. Defendant was also able to log in to his account to get video notifications, watch videos, favorite the videos that he watched

4

1  and create playlists of the videos.

2  11.    Throughout Plaintiff Browne's interactions with Defendant's Website, Plaintiff Browne maintained and used Plaintiff's Facebook account, which publicly disclosed certain information about him, including but not limited to his name, picture, familial relationships, etc., from the same browser Plaintiff Browne used to watch a prerecorded video from Defendant's Website.

7  12.    Pursuant to the systematic process described herein, each time Plaintiffs or another consumer requested and prerecorded viewed video content through the Website, Defendant caused their video viewing history to be sent along their personally identifiable information ("PII"), such as their name and photo, to Facebook and other third parties, without Plaintiffs' knowledge or consent.

12  13.    Plaintiffs never consented, agreed, nor permitted Defendant to disclose Plaintiffs' PII and viewing information to Facebook or other third parties and certainly did not do so for purposes violative of the VPPA.

15  14.    Defendant Prager University Foundation is a Virginia corporation with its principal place of business located in Sherman Oaks, California.

**GENERAL ALLEGATIONS**

*History and Overview of the VPPA*

19  15.    The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the

confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

16. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

17. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of

6

prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

### *Defendant is a Video Tape Service Provider*

18. Defendant offers a wide array of prerecorded videos for viewing on its Website that it creates and hosts related to entertainment, politics, philosophy and religion, amongst other things.

19. Defendant has consumers in the form of individuals who:

    a. Viewed or requested prerecorded videos on Defendant's Website; and/or

    b. Subscribed to Defendant's newsletter by providing personal information, such as at a minimum, their email address, stored cookie data, and IP address; and/or

    c. Created an account with Defendant by providing personal information, such as at a minimum their email address, stored cookie data, IP address, and first and last name; and/or

    d. Made purchases from Defendant's online store.

### *Defendant Knowingly Discloses Consumers' PII To Third Parties*

20. When customers request, view or purchase audiovisual content from Defendant's Website or Apps, their Personal Viewing Information is transmitted to Facebook, and other unauthorized third parties as a result of the tracking tools that

Defendant purposely installed and implemented on its Website and Apps. Defendant controlled its Website, Apps, and all of the tracking technologies that it used to transmit its customers' Personal Viewing Information to unauthorized parties. Importantly, Facebook would not have received Plaintiffs' or the Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API,[1] and other tracking technologies on its Website and Apps.

21. Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its customers requested or viewed its video content.

22. Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its customers' interactions with the Website and Apps, including their video viewing habits; (2) it requested and installed lines of code that achieved this purpose despite the existence of other configurations of that code; (3) it obtained the lines of code from Facebook and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the Apps.

**Defendant's use of Facebook Business Tools and Tracking Pixels**

23. Facebook is a real identity platform, meaning that users are allowed only

---

[1] Notably, the Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its consumer's viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

one account and must share the name they go by in everyday life. To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

24. Businesses, such as Defendant, use Facebook's Business Tools to monitor and record their website and app visitors' devices and specific activities for marketing purposes.

25. More specifically, the Facebook pixel that Defendant installed and used tracked, recorded, and sent Facebook its customers' granular Website and App activity, including the names of specific prerecorded videos that customers requested and/or viewed each time through Defendant's Website and Apps. The information is not merely metadata.

26. Defendant's motivation for using the Facebook Pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services that Defendant would otherwise have to pay for.

27. The information Facebook receives from Defendant identifies customers based on their unique and persistent Facebook IDs ("FID"), which is sent to Facebook as one data point alongside the title of the audiovisual material the specific customer requested or purchased.

28. Notably, these marketing tools are not required for Defendant's Website or Apps to function properly. Even if it finds the tools helpful, it could have used them

1  in a manner that does not reveal its customers' Personal Viewing Information.

2  29. Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the person's online user name, real name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, dating preferences, personal interests, and more.

3  30. All that would be required would be to append the Facebook ID to the end of the URL http://www.facebook.com, i.e., Facebook.com/"FacebookID". This would take you to the Facebook page of the person whose Facebook ID you have, and at a minimum reveal their photo, name, gender, location, as well as other information such as friends, familial connections, etc.

4  31. The data revealed would be obtainable to any person, not just Facebook, because if a person has a Facebook account, there is always a certain amount of data associated with that account that is public to everyone. And Facebook itself, which is a third-party, has access to even more personal information than what is put out to the public. Here, both Plaintiffs had their name, photos, genders, Facebook friends, Facebook handles, and other personal information publicly available to anyone who

had their Facebook ID. At a minimum, Prager revealed this PII (along with the titles of the videos that Plaintiffs watched) to Facebook.

### *Defendant's Use of Tracking Tools*

32. When Defendant's consumers request or view audio visual content on Defendant's Website, the specific title of the video or video game is transmitted to Facebook alongside the customers' persistent and unique Facebook identifiers, thereby revealing their Personal Viewing Information to Facebook. However, consumers are unaware of this because, amongst other things, Defendant's transmissions are completely invisible to ordinary consumers viewing Defendant's webpages.

33. While Figure 1 shows what ordinary consumers see on their screens as they interact with the Website, Figures 2 shows how Defendant sends to Facebook Plaintiffs and the Class Members PII along with the title of the video watched by a consumer through the Website.

**[Intentionally Left Blank]**

11



*Figure 1. The image above is a screenshot of what a user sees when they attempt to watch a video on Defendant's Website. The page does not contain any logos or indications that their interactions are recorded and sent to Facebook.*



*Figure 2. The images above represent a screenshot of a network traffic report that was taken when a user attempts to watch a video from Defendant's Website, at which time the personal viewing information was transmitted to Facebook.*

12

34. Defendant also transmits its customers' Personal Viewing Information to Facebook and additional unauthorized third parties – including Google, MNTN, Inc., and Twitter – through other tracking technologies installed on its Website and Apps.

35. The Personal Viewing Information that Defendant obtained from Plaintiffs and the Class Members is valuable data in the digital advertising-related market for consumer information.

36. At no point did Plaintiffs or the Class Members consent to Defendant's disclosure of their video viewing history to third parties. As such, Defendant deprived Plaintiffs and the Class Members of their privacy rights and control over their personal information.

37. The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiffs' and the Class Members' personal information, including their private video viewing histories.

**CLASS ACTION ALLEGATIONS**

38. Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, used Defendant's Website or Apps to view, purchase, request or obtain prerecorded audio visual materials

39. The Class does not include (1) Defendant, its officers, and/or its directors;

13

or (2) the Judge to whom this case is assigned and the Judge's staff.

40. Plaintiffs reserve the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

41. ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

42. ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

43. ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

   (a) Whether Defendant collected Plaintiffs' and the Class Members' PII;
   (b) Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;
   (c) Whether Defendant's disclosures were committed knowingly;

and

(d) Whether Defendant disclosed Plaintiffs' and the Class Members' PII without consent.

44. ***Typicality:*** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, requested and viewed audio visual materials on Defendant's Website and had their PII collected and disclosed by Defendant to third parties.

45. ***Adequacy***: Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class because Plaintiffs have no interests that are adverse to the interests of the members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained skilled and experienced counsel.

46. Moreover, the proposed Class can be maintained because it satisfies both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members of the Class to seek to redress their claims other than through the procedure of

a class action; and

(c)   Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

47. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

48. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

49. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—hundreds of prerecorded videos on a wide array of topics—and those deliveries affect interstate or foreign commerce.

50. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider."

Plaintiffs and the Class Members are "consumers" because they:

    a. Created an account with Defendant by providing at a minimum, their first and last names, IP addresses, and email addresses, then purchased, requested and/or viewed audio visual materials;
    b. Subscribed to Defendant's newsletter by providing at a minimum, their IP addresses and email addresses, then requested and/or viewed audio visual materials; and/or
    c. Made a purchase from Defendant's store through Defendant's Website.

51. Defendant knowingly caused Plaintiffs' and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to third parties, such as Facebook. This information constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) because it identifies Plaintiffs and Class members to third parties as individuals who purchased or requested audiovisual materials from Defendant. This information allowed third parties, such as Facebook, to identify each Plaintiff's and Class Member's specific video viewing preferences and habits.

52. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer…is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent from Plaintiffs and the Class Members under this definition.

17

53. Defendant was aware that the disclosures to third parties that it shared through the tracking software that it incorporated in its Website and Apps identified Plaintiffs and the Class Members. Indeed, Facebook publicly touts its ability to connect PII to individual user profiles. Defendant also knew that Plaintiffs' and the Class Members' Personal Viewing Information was disclosed to third parties because Defendant programmed the tracking software into the Website's and Apps' code so that third parties would receive the video titles and consumer's unique third-party identifiers when a consumer requested and/or purchased a videos or other prerecorded audio visual material on the Website or Apps. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook and other third parties, by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

54. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's and app's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

55. On behalf of Plaintiffs and the Class Members, Plaintiffs seek declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class, and Plaintiffs' Counsel as Class Counsel;

b) For an order declaring that Defendant's conduct violates each of the statutes referenced herein;

c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e) For prejudgment interest on all amounts awarded;

f) For an order of restitution and all other forms of equitable monetary relief;

g) For injunctive relief as pleaded or as the Court may deem proper;

h) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of members of the Class, demand a trial by jury on all causes of action and issues so triable.

Dated: August 6, 2025                Respectfully submitted,

/s/ Frank S. Hedin
Frank S. Hedin
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
fhedin@hedinllp.com

– and –

Adrian Gucovschi
Nathaniel Haim Sari
**Gucovschi Rozenshteyn, PLLC**
140 Broadway, FL 46
New York, NY 10005
Telephone: (212) 884-4230
adrian@gr-firm.com
nsari@gr-firm.com

*Counsel for Plaintiffs and the Putative Class*