Frank S. Hedin (SBN 291289)
Hedin LLP
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:    (305) 200-8801
E-Mail:       fhedin@hedinllp.com

*Counsel for Plaintiffs and
the Putative Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA CHANDRA AND DAMANY BROWNE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>  v.<br><br>PRAGER UNIVERSITY FOUNDATION,<br><br>                    Defendant. | Case No. 2:25cv3984<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Sylvia Chandra and Damany Browne ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Prager University Foundation ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## **NATURE OF THE CASE**

1. Defendant Prager University Foundation ("Defendant") owns and operates its online and mobile applications ("Apps"), including prageru.com (the "Website"). Through its Website and Apps, Defendant creates and hosts a massive library of videos on many topics, including, but not limited to, philosophy, education, politics, and religion. Further, Defendant also creates and hosts hundreds of educational and entertainment videos explicitly targeted to kids, through its PragerU Kids brand, which it maintains on its Website.

2. Unbeknownst to Plaintiffs and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user or audiovisual content purchased —to unauthorized third parties without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

**JURISDICTION AND VENUE**

3.    This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees and costs; and (3) Defendant and at least one Class member are domiciled in different states.

4.    This Court has personal jurisdiction over Defendant because it is headquartered in this District. Defendant also conducts substantial business within California, including the sale, marketing, and advertisement of its Website, Apps, products and services.

5.    Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant is headquartered in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

**PARTIES**

6.    Plaintiff Sylvia Chandra is a citizen of New York, who resides in Deer Park, New York. Plaintiff Sylvia Chandra has created an account with Defendant, by providing Defendant her email address and first and last name, and thereafter watched prerecorded videos on Defendant's Website within the two years preceding the filing

3

1   of this Action.

2       7.      By providing her email address and creating an account with Defendant

3   and/or subscribing to Defendant's newsletter, she became a subscriber to Defendant's

4   services with an ongoing relationship with Defendant whereby Defendant would send

5   her promotional emails.

6       8.      Throughout Plaintiff Chandra's interactions with Defendant's Website,

7   Plaintiff Sylvia Chandra has maintained and used Plaintiff's Facebook account, which

8   publicly disclosed certain information about her including but not limited to her name,

9   picture, familial relationships etc., from the same browser Plaintiff used to watch

10  prerecorded videos from Defendant's Website.

11      9.      Plaintiff Damany Browne is a citizen of New York, who resides in

12  Brooklyn, New York. Plaintiff Damany Browne has created an account with Defendant,

13  by providing Defendant his email address and first and last name, and watched

14  prerecorded videos on Defendant's Website within the two years preceding the filing

15  of this Action.

16      10.     By providing his email address and creating an account with Defendant,

17  Plaintiff Browne became a subscriber to Defendant's services. As part of this

18  relationship, Defendant would send emails to Plaintiff Brone regarding new video

19  content and articles. Plaintiff Browne was also able to log in to his account to get video

20  notifications, watch videos, favorite the videos that he watched and create playlists of

1   the videos.

2        11.    Throughout Plaintiff Browne's interactions with Defendant's Website,

3   Plaintiff Browne maintained and used Plaintiff's Facebook account, which publicly

4   disclosed certain information about him, including but not limited to his name, picture,

5   familial relationships, etc., from the same browser Plaintiff used to watch prerecorded

6   videos from Defendant's Website.

7        12.    Pursuant to the systematic process described herein, Defendant caused

8   Plaintiff Sylvia Chandra and Plaintiff Damany Browne's video viewing histories to be

9   sent along with their Facebook IDs and other stored identifiers (collectively referred to

10  herein as personally identifiable information "PII") to Facebook and upon information

11  and belief, other third parties, without Plaintiffs' knowledge or consent each time they

12  requested or obtained prerecorded viewed video content through the Website.

13       13.    Plaintiffs never consented, agreed, nor permitted Defendant to transmit or

14  otherwise disclose their PII and video viewing information to Facebook or other third

15  parties and certainly did not do so for purposes violative of the VPPA.

16       14.    Defendant Prager University Foundation is a Virginia corporation with its

17  principal place of business located in Sherman Oaks, California.

18                              **<u>GENERAL ALLEGATIONS</u>**

19                          ***History and Overview of the VPPA***

20       15.    The impetus for the VPPA began with President Ronald Reagan's

5

nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

16.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

17.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or

obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

### *Defendant is a Video Tape Service Provider*

18.    Defendant offers a wide array of prerecorded videos on its Website and App, created and hosted by it, related to entertainment, politics, philosophy, and religion, amongst other things.

19.    Defendant has consumers in the form of individuals who:

a.  Viewed or requested prerecorded videos on Defendant's Website; and/or

b.  Subscribed to Defendant's newsletter by providing personal information, such as at a minimum, their email address, stored cookies, and IP address; and/or

c.  Created an account with Defendant by providing personal information, such as at a minimum their email address, stored cookies, IP address; and first and last name; and/or

d.  Made purchases from Defendant's online store.

7

***Defendant Knowingly Discloses Consumers' PII To Third Parties***

20.    When consumers request, view or purchase audiovisual content from Defendant's Website or Apps, Defendant transmits their Personal Viewing Information to Facebook and other unauthorized third parties as a result of the tracking tools that Defendant purposely installed and implemented on its Website and Apps. Defendant controlled its Website and Apps, and all of the tracking technologies that it used to transmit its consumers' Personal Viewing Information to unauthorized parties. Importantly, Facebook would not have received Plaintiffs' or the Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API,[1] and other tracking technologies on its Website and Apps.

21.    Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its consumers requested or viewed its video content.

22.    Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its consumers' interactions with the Website and Apps, including their video viewing habits; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded,

---

[1] Notably, the Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its consumer's viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

1    and transmitted via the Website and the Apps.

2    ***Defendant's use of Facebook Business Tools and Tracking Pixels***

3    23.    Facebook is a real identity platform, meaning that users are allowed only

4    one account and must share the name they go by in everyday life. To that end, when

5    creating an account, users must provide their first and last name, along with their

6    birthday and gender.

7    24.    Businesses, such as Defendant, use Facebook's Business Tools to monitor

8    and record their website and app visitors' devices and specific activities for marketing

9    purposes.

10    25.    More specifically, the Facebook pixel that Defendant installed and used

11    tracked, recorded, and sent Facebook its consumers' granular Website and Apps

12    activity, including the names of specific prerecorded videos that consumers' requested

13    and/or viewed each time through Defendant's Website and Apps. The information is

14    not merely metadata.

15    26.    Defendant's motivation for using the Facebook Pixel and related Facebook

16    Business Tools is simple—it financially benefits Defendant in the form of advertising

17    and information services that Defendant would otherwise have to pay for.

18    27.    The information Facebook receives from Defendant identifies consumers

19    by their unique, persistent Facebook IDs ("FID"), which are sent to Facebook as one

20    data point alongside the title of the audio visual material the specific consumer

9

1    requested or purchased.

2    28.    Notably, these marketing tools are not required for Defendant's Website

3    or Apps to function correctly. Even if it finds the tools helpful, it could have used them

4    in a manner that does not reveal its consumers' Personal Viewing Information.

5    29.    Any ordinary person who comes into possession of a Facebook ID can

6    easily use that information to identify a particular individual and their corresponding

7    Facebook profile, which contains additional information such as the person's online

8    user name, real name, gender, birthday, place of residence, career, educational history,

9    a multitude of photos, and the content of a Facebook user's posts. This information may

10   reveal even more sensitive personal information—for instance, posted photos may

11   disclose the identity of family members, and written posts may disclose religious

12   preferences, political affiliations, personal interests, and more.

13   30.    All that would be required would be to append the Facebook ID to the end

14   of    the    URL    facebook.com    or    facebook.com/profile.php?id=,    e.g.,

15   Facebook.com/"FacebookID"  or  facebook.com/profile.php?id="FacebookID".  This

16   would take you to the Facebook page of the person whose Facebook ID you have, and

17   at a minimum reveal their photo, name, gender, location, as well as other information

18   such as friends, familial connections, etc.

19   31.    The data revealed would be obtainable to any person, not just Facebook,

20   because if a person has a Facebook account, there is always a certain amount of data

associated with that account that is public to everyone. And Facebook itself, which is a third-party, has access to even more personal information than what is available to the public.  Here, both Plaintiffs had their name, photos, genders, Facebook friends, and Facebook handles, among other personal information, publicly available to anyone who had their Facebook ID. Here, by operation of the Meta Pixel and third-party tracking technology, Prager revealed Plaintiffs' Facebook IDs, and other identifiable information, along with the titles of the videos Plaintiffs watched to Facebook.

### *Defendant's Use of Tracking Tools*

32.     When Defendant's consumers' request or view audio visual content on Defendant's Website, the specific title of the video  is transmitted to Facebook alongside the consumers' persistent and unique Facebook identifiers, thereby revealing their Personal Viewing Information to Facebook. However, consumers' are unaware of this because, amongst other things, Defendant does not inform visitors or subscribers to its Website that their interactions with its Website are logged as alleged herein and their personally identifiable information is contemporaneously transmitted to Facebook.

33.     When a consumer watches a video on Defendant's Website, Facebook makes a request to Defendant's server, requesting that Defendant capture and then transfer the video title as well as the user's Facebook ID (from the stored cookies on a consumer's device). Defendant then responds to Facebook's server request and sends the video title based on the consumer's interaction with Defendant's Website and the

Facebook ID (from stored cookies) and other personal identifiers to Facebook in an easily readable, unencrypted format.

34.    The figures below show what an ordinary person sees, as well as what is being sent to Facebook. These figures were captured by using network tools that are built into ordinary computer browsers, such as Chrome, Microsoft Edge, etc. They reflect the requests made to Defendant's Website by Facebook, and Defendant's response to those requests.

35.    Figure 1 shows what ordinary consumers see on their screens when they watch a video on the Website.



*Figure 1*

36.    Figure 2 shows the network requests happening behind the scenes, i.e., the communications transpiring between Defendant and Facebook. The "payload" reflects

data being transferred to Facebook. By looking at the "payload," the Figure reveals that

the data Defendant is transferring to Facebook includes the video title for the

consumer's current video viewing session. In this illustration, the title is plainly spelled

out twice as "https://www.prageru.com/videos/do-women-belong-in combat" and {"title":" Do

Women Belong in Combat? | PragerU"}



*Figure 2*

37.    Defendant transfers to Facebook individual titles of prerecorded videos

watched by users. While Figure 2 shows that Defendant is transferring individual titles

to Facebook during viewing sessions, Figure 3 shows the cookies associated with each

viewing session that are also being transferred to Facebook. The purpose of the cookie

is to associate a specific person with the data being transferred (i.e., session interactions

and video titles). Figure 3 shows explicitly the cookies related to the session in Figure

2. As illustrated in Figure 3, each time the consumer watches a prerecorded video, Defendant transfers to Facebook alongside the title of the prerecorded video material, a consumer's c_user cookie that is specifically designed to reflect the user's Facebook ID.[2] As shown in Figure 3, identifying the c_user is not tricky, requires no technological training, and is not laborious. It is shown plainly on the left-hand side of the table labeled "c_user." And the value is clearly shown on the right side of c_user; in this illustration, it is 100069197062755, reflecting the user's Facebook ID.



*Figure 3*

38. None of the viewing data sent by Defendant to Facebook is encrypted in any way, shape, or form.

39. For each video request made by the user on Defendant's Website, Defendant transmits to Facebook the title of the video and the user's Facebook ID.

---

[2] The Facebook ID is stored in a small piece of code known as a "cookie" that Meta launches and stores in the internet browsers of each Meta accountholder's device(s) to distinguish between website visitors. *See* Meta, *How to Create a Custom Audience from Your Customer List*, FACEBOOK FOR BUSINESS, https://www.facebook.com/business/help/471978536642445?id=120537668283214 2 (last visited Oct. 27, 2025)

40.    After becoming subscribers to Defendant, and within the statute of limitations period, the individual Plaintiffs had their PII transmitted or otherwise disclosed in the same manner outlined and shown in Figures 1, 2 and 3.

41.    Upon information and belief, Defendant also transmits its consumers' Personal Viewing Information to Facebook and additional unauthorized third parties – including Google, TikTok, and Twitter – through other tracking technologies installed on its Website and Apps.    The personally identifiable information disclosed by Defendant to these third parties includes email addresses used for account registration and other personal identifiers stored on their devices in the browser's cookies.

42.    The Personal Viewing Information that Defendant obtained from Plaintiffs and the Class Members is valuable data in the digital advertising-related market for consumer information.

43.    At no point did Plaintiffs or the Class Members consent to Defendant's disclosure of their video viewing history to third parties. As such, Defendant deprived Plaintiffs and the Class Members of their privacy rights and control over their personal information.

44.    The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiffs' and the Class Members' personal information, including their private video viewing histories.

## **CLASS ACTION ALLEGATIONS**

45.    Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, used Defendant's Website or Apps to view, purchase, or request prerecorded audio visual materials using their mobile or computer browsers.

46.    The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

47.    Plaintiffs reserve the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

48.    ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

49.    ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

50.    ***Existence and predominance of common questions of law and fact***:

Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

(a)    Whether Defendant collected Plaintiffs' and the Class Members' PII;

(b)    Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c)    Whether Defendant's disclosures were committed knowingly; and

(d)    Whether Defendant disclosed Plaintiffs' and the Class Members' PII without consent.

51.    ***Typicality:*** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, requested and viewed audio visual materials on Defendant's Website and had their PII collected and disclosed by Defendant to third parties.

52.    ***Adequacy***: Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiffs are adequate representatives of the Class because Plaintiffs have no interests that are adverse to the interests of the members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained skilled and experienced counsel.

53.    Moreover, the proposed Class can be maintained because it satisfies both

1  Rule 23(a) and 23(b)(3) because questions of law or fact common to the Class

2  predominate over any questions affecting only individual members and a Class Action

3  is superior to all other available methods of the fair and efficient adjudication of the

4  claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

5      (a)    The expense and burden of individual litigation makes it economically

6  unfeasible for members of the Class to seek to redress their claims other than through

7  the procedure of a class action;

8      (b)    If separate actions were brought by individual members of the Class, the

9  resulting duplicity of lawsuits would cause members of the Class to seek to redress their

10  claims other than through the procedure of a class action; and

11     (c)    Absent a class action, Defendant likely will retain the benefits of its

12  wrongdoing, and there would be a failure of justice.

13                    **CAUSES OF ACTION**

14                         **COUNT I**
                **Violation of the Video Privacy Protection Act**
15                **18 U.S.C. § 2710, *et seq.***

16     54.    Plaintiffs incorporate by reference each of the allegations contained in the

17  foregoing paragraphs of this Complaint as though fully set forth herein.

18     55.    The VPPA prohibits a "video tape service provider" from knowingly

19  disclosing "personally-identifiable information" concerning any "consumer" to a third-

20  party without the "informed, written consent (including through an electronic means

18

using the Internet) of the consumer." 18 U.S.C. § 2710.

56.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—hundreds of prerecorded videos on a wide array of topics—and those deliveries affect interstate or foreign commerce.

57.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and the Class Members are "consumers" because they:

a.    Created an account with Defendant by providing at a minimum, their first and last name, IP address, browser's stored cookies, and email address, then purchased, requested and/or viewed audio visual materials;

b.    Subscribed to Defendant's newsletter by providing at a minimum, their IP address, browser's stored cookies,  and email address, then requested and/or viewed audio visual materials; and/or

c.    Purchased from Defendant's store through Defendant's Website.

58.    Defendant knowingly caused Plaintiffs' and the Class Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed

19

to third parties, such as Facebook. This information constitutes "personally identifiable information" under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class members to third parties as individuals who purchased or requested audiovisual materials from Defendant. This information allowed third parties, such as Facebook, to identify each Plaintiff and Class Member's specific video viewing preferences and habits.

59. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;" and (2) "at the election of the consumer…is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent from Plaintiffs and the Class Members under this definition.

60. Defendant was aware that the disclosures to third parties that it shared through the tracking software that it incorporated in its Website and Apps identified Plaintiffs and the Class Members. Indeed, Facebook publicly touts its ability to connect PII to individual user profiles. Defendant also knew that Plaintiffs' and the Class Members' Personal Viewing Information were disclosed to third parties because Defendant programmed the tracking software into the Website's and Apps' code so that third parties would receive the video titles and consumer's unique third-party identifiers

when a consumer requested and/or purchased a videos or other prerecorded audio visual material on the Website or Apps. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook and other third parties by providing them with additional data they can leverage for their advertising, analytics, and/or other services.

61.    Nor were Defendant's disclosures made in the "ordinary course of business" as the VPPA defines the term. In particular, the Website's and app's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

62.    On behalf of Plaintiffs and the Class Members, Plaintiffs seek declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class, and Plaintiffs' Counsel as Class Counsel;

b)    For an order declaring that Defendant's conduct violates each of the statutes referenced herein;

c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

21

e)   For prejudgment interest on all amounts awarded;

f)   For an order of restitution and all other forms of equitable monetary relief;

g)   For injunctive relief as pleaded or as the Court may deem proper;

h)   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiffs, individually and on behalf of members of the Class, demand a trial by jury on all causes of action and issues so triable.

Dated: November 4, 2025                    Respectfully submitted,

*/s/ Frank S. Hedin*
Frank S. Hedin
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
fhedin@hedinllp.com

**– and –**

Adrian Gucovschi
Nathaniel Haim Sari
**Gucovschi Law Firm, PLLC**
140 Broadway, FL 46
New York, NY 10005
Telephone: (212) 884-4230
adrian@gucovschilaw.com
nathaniel@gucovschilaw.com

*Counsel for Plaintiff and the Putative Class*

22