Frank S. Hedin (SBN 291289)
Hedin LLP
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone:   (305) 357-2107
Facsimile:   (305) 200-8801
E-Mail:      fhedin@hedinllp.com

*Counsel for Plaintiffs and
the Putative Class*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA CHANDRA AND DAMANY BROWNE, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>PRAGER UNIVERSITY FOUNDATION,<br><br>     Defendant. | Case No. 2:25cv3984<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**~~FIRST~~ SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Sylvia Chandra and Damany Browne ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Prager University Foundation ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on their personal knowledge.

## **NATURE OF THE CASE**

1.    Defendant Prager University Foundation ("Defendant") owns and operates its online and mobile applications ("Apps"), including prageru.com (the "Website"). Through its Website and Apps, Defendant creates ~~videos~~ and hosts a massive library of videos on~~related to~~ many~~a number of~~ topics, including, but not limited to, philosophy, education, politics, and religion. Further, Defendant also creates and hosts hundreds of educational and entertainment videos explicitly targeted~~targeted specifically~~ to kids, through its ~~prageru~~ PragerU ~~kids~~ Kids brand, which it maintains on its Website~~Website~~.

2.    Unbeknownst to Plaintiffs and the Class Members, Defendant knowingly and intentionally discloses its users'~~users'~~ personally identifiable information—including a record of every video viewed by the user or audiovisual content purchased—to unauthorized third parties without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2

**JURISDICTION AND VENUE**

3.     This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs'Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys'attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

4.     This Court has personal jurisdiction over Defendant because it is headquartered in this District. Defendant also conducts substantial business within California, including the sale, marketing, and advertisement of its Website, Apps, products and services.

5.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Defendant is headquartered in this District, and a substantial part of the events giving rise to Plaintiffs'Plaintiffs' claims took place within this District.

**PARTIES**

6.     Plaintiff Sylvia Chandra is a citizen of New York, who resides in Deer Park, New York. Plaintiff Sylvia Chandra has created an account with Defendant, by providing Defendant her email address and first and last name, and thereafter watched a prerecorded videos on Defendant'sDefendant's Website within the last two years of

3

1  preceding the filing of this Action~~Complaint~~.

2      7.    By providing her email address and creating an account with ~~Plaintiff~~

3  Defendant and/or subscribing to Defendant's~~Defendant's~~ newsletter, she became a

4  subscriber to Defendant's~~Defendant's~~ services ~~and had~~ with an ongoing relationship

5  with Defendant whereby Defendant would send her promotional emails.

6      8.    Throughout    Plaintiff    Chandra's~~Chandra's~~    interactions    with

7  Defendant's~~Defendant's~~ Website, Plaintiff Sylvia Chandra has maintained and used

8  Plaintiff's~~Plaintiff's~~ Facebook account, which publicly disclosed certain information

9  about her including but not limited to her name, picture, familial relationships etc., from

10  the    same    browser    Plaintiff    used    to    watch    a    prerecorded    videos    from

11  Defendant's~~Defendant's~~ Website.

12      9.    Plaintiff Damany Browne is a citizen of New York, who resides in

13  Brooklyn, New York. Plaintiff Damany Browne has created an account with Defendant,

14  by providing Defendant his email address and first and last name, and watched

15  prerecorded videos on Defendant's~~Defendant's~~ Website within the ~~last~~ two years ~~of~~

16  preceding the filing of this ~~Complaint~~Action.

17      10.    By providing his email address and creating an account with

18  ~~Plaintiff~~Defendant, Plaintiff Browne became a subscriber to Defendant's~~Defendant's~~

19  services. As part of this relationship, Defendant would send emails to ~~Defendant~~

20  Plaintiff Brone regarding new video content and articles. Plaintiff Browne ~~Defendant~~

1  was also able to log in to his account to get video notifications, watch videos, favorite

2  the videos that he watched and create playlists of the videos.

3      11.    Throughout    Plaintiff    Browne's~~Browne's~~    interactions    with

4  Defendant's~~Defendant's~~    Website,    Plaintiff    Browne    maintained    and    used

5  Plaintiff's~~Plaintiff's~~ Facebook account, which publicly disclosed certain information

6  about him, including but not limited to his name, picture, familial relationships, etc.,

7  from the same browser Plaintiff used to watch ~~a~~ prerecorded videos from

8  Defendant's~~Defendant's~~ Website.

9      12.    Pursuant to the systematic process described herein, Defendant caused

10 Plaintiff Sylvia Chandra and Plaintiff Damany Browne's~~Browne's~~ video viewing

11 histories~~y~~ to be sent along with their~~Plaintiffs' personally identifiable information~~

12 ~~("PII"), in the form of their~~ Facebook IDs and other stored identifiers (collectively

13 referred to herein as personally identifiable information "PII"),~~such as their name and~~

14 ~~photo,~~ to Facebook and upon information and belief, other third parties, without

15 Plaintiffs'~~Plaintiff's~~ knowledge or consent each time ~~Plaintiff~~ they requested ~~and~~or

16 obtained prerecorded viewed video content through the Website~~Website~~.

17      13.    Plaintiffs never consented, agreed, nor permitted Defendant to transmit or

18 otherwise disclose their~~Plaintiffs'~~ PII and video viewing information to Facebook or

19 other third parties and certainly did not do so for purposes violative of the VPPA.

20      14.    Defendant Prager University Foundation is a Virginia corporation with its

principal place of business located in Sherman Oaks, California.

## **GENERAL ALLEGATIONS**

### *History and Overview of the VPPA*

15. The impetus for the VPPA began with President Ronald Reagan's~~Reagan's~~ nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's~~nominee's~~ rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's~~nobody's~~ business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

16. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's~~Act's~~ applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

17.     The VPPA prohibits ""[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."" 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information (""PII"") as ""information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."" 18 U.S.C. § 2710(a)(3). A video tape service provider is ""any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."" 18 U.S.C. § 2710(a)(4).

### *Defendant is a Video Tape Service Provider*

18.     Defendant offers a wide array of prerecorded videos ~~for viewing~~ on its Website and App.~~Website~~ created and hosted by it~~that it creates and hosts~~ related to entertainment, politics, philosophy, and religion, amongst other things.

19.     Defendant has consumers in the form of individuals who:

  a.  Viewed or requested prerecorded videos on Defendant's~~Defendant's~~ Website; and/or

  b.  Subscribed to Defendant's~~Defendant's~~ newsletter by providing personal information, such as at a minimum, their email address, stored cookies, and IP address; and/or

  c.  Created an account with Defendant by providing personal information,

1    such as at a minimum their email address, stored cookies, IP address;

2    and first and last name; and/or

3        d.  Made purchases from Defendant's ~~Defendant's~~ online store.

4        ~~d.~~

5    ***Defendant Knowingly Discloses Consumers' ~~Consumers'~~ PII To Third Parties***

6    20.    When ~~customers~~ consumers request, view or purchase audiovisual content

7    from Defendant's ~~Defendant's~~ Website or Apps, Defendant transmits their Personal

8    Viewing Information ~~their Personal Viewing Information is transmitted~~ to Facebook,

9    and other unauthorized third parties as a result of the tracking tools that Defendant

10    purposely installed and implemented on its Website and Apps. Defendant controlled its

11    Website and , Apps, and all of the tracking technologies that it used to transmit its

12    consumer ~~ustomers'~~ ~~customers'~~ Personal Viewing Information to unauthorized parties.

13    Importantly, Facebook would not have received Plaintiffs' ~~Plaintiffs'~~ or the Class

14    Members' ~~Members'~~ Personal Viewing Information but for Defendant's ~~Defendant's~~

15    decision to install and use Facebook's ~~Facebook's~~ Business Tools, including the

16    Facebook Pixel and Conversions API,[1] and other tracking technologies on its Website

17    and Apps.

18    21.    Moreover, Defendant controlled which data was tracked, recorded, and

19

---

20    [1] Notably, the Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its consumer's viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

1    transmitted when its ~~customers~~ consumers requested or viewed its video content.

2         22.    Defendant's~~Defendant's~~ knowledge as to its conduct is evidenced by the

3    fact that: (1) it chose to track its ~~customers'customers'~~consumers' interactions with the

4    Website and Apps, including their video viewing habits; (2) it requested and installed

5    lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook

6    and other third parties in order to achieve this purpose; and (4) it controlled the

7    information that was tracked, recorded, and transmitted via the Website and the Apps.

8    **Defendant's~~Defendant's~~ use of Facebook Business Tools and Tracking Pixels**

9         23.    Facebook is a real identity platform, meaning that users are allowed only

10   one account and must share the name they go by in everyday life. To that end, when

11   creating an account, users must provide their first and last name, along with their

12   birthday and gender.

13        24.    Businesses, such as Defendant, use Facebook's~~Facebook's~~ Business Tools

14   to monitor and record their website and app visitors'~~visitors'~~ devices and specific

15   activities for marketing purposes.

16        25.    More specifically, the Facebook pixel that Defendant installed and used

17   tracked, recorded, and sent Facebook its ~~customers'customers'~~consumers' granular

18   Website and Apps activity, including the names of specific prerecorded videos that

19   ~~customers~~ consumers' requested    and/or    viewed    each    time    through

20   Defendant's~~Defendant's~~ Website and Apps. The information is not merely metadata.

9

26.     Defendant's~~Defendant's~~ motivation for using the Facebook Pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services that Defendant would otherwise have to pay for.

27.     The information Facebook receives from Defendant identifies ~~customers~~ consumers by~~based on~~ their unique,~~, and~~ persistent Facebook IDs (""FID""), which are~~is~~ sent to Facebook as one data point alongside the title of the audio visual~~audio visual~~ material the specific ~~customer~~ consumer requested or purchased.

28.     Notably, these marketing tools are not required for Defendant's~~Defendant's~~ Website or Apps to function correctly~~properly~~. Even if it finds the tools helpful, it could have used them in a manner that does not reveal its ~~customers'~~~~customers'~~consumers' Personal Viewing Information.

29.     Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the person's~~person's~~ online user name, real name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's~~user's~~ posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests, and more.

30.    All that would be required would be to append the Facebook ID to the end of the URL facebook.com or facebook.com/profile.php?id=, e.g., x. Facebook.com/"""FacebookID" or facebook.com/profile.php?id="FacebookID"". This would take you to the Facebook page of the person whose Facebook ID you have, and at a minimum reveal their photo, name, gender, location, as well as other information such as friends, familial connections, etc.

31.    The data revealed would be obtainable to any person, not just Facebook, because if a person has a Facebook account, there is always a certain amount of data associated with that account that is public to everyone. And Facebook itself, which is a third-party, has access to even more personal information than what is put out available to the public.  Here, both Plaintiffs had their name, photos, genders, Facebook friends, and Facebook handles, and among other personal information, publicly available to anyone that who had their Facebook ID. Here, by operation of the Meta Pixel and third-party tracking technology, Prager revealed this Plaintiffs' PII names, Facebook IDs, and other identifiable information at a minimum, along with the titles of the videos Plaintiffs' watched to to Facebook.

***Defendant's*Defendant's *Use of Tracking Tools**

32.    When Defendant'sDefendant's customers consumers' request or view audio visual content on Defendant'sDefendant's Website, the specific title of the video or video game is transmitted to Facebook alongside the

1  customers'customers'consumers' persistent and unique Facebook identifiers, thereby

2  revealing their Personal Viewing Information to Facebook. However, customers

3  consumers' are unaware of this because, amongst other things, Defendant does not

4  inform visitors or subscribers to its Website that's their transmissions interactions with

5  its Website are logged as alleged herein and their personally identifiable information is

6  contemporaneously transmitted to Facebookare completely invisible to ordinary

7  customers viewing Defendant's webpages.

8      32.33.When a consumer watches a video on Defendant'sDefendant's

9  Websitewebsite, Facebook makes a request to the Defendant'sDefendant's server to ,

10  requesting that Defendant capture and then transfer the video title as well as the

11  user'suser's Facebook ID (from the stored cookies on a consumer's device). Defendant

12  then responds to Facebook'sFacebook's server request and sends the video title based

13  on the consumer's interaction with Defendant's Website and the Facebook ID (from

14  stored cookies) and other personal identifiers to Facebook in an easily readable,

15  unencrypted format.

16      34.    The below figures below show what an ordinary person sees, as well as

17  what is being sent to Facebook. These figures were captured by using network tools that

18  are built into ordinary computer browsers, such as Chrome, Microsoft eEdge, etc. They

19  reflect the requests made to Defendant'sDefendant's Websitewebsite by Facebook, and

20  Defendant'sDefendant's response to those requests.

35.   ~~While~~ Figure 1 shows what ordinary ~~customers~~ consumers ~~sees~~ on their screens ~~as~~ when they watch a video on ~~they use the~~ the Website~~Website~~.



*Figure 1*

36.   ~~,~~Figures 2 ~~shows~~ shows the network requests happening behind the scenes, i.e., the communications transpiring between Defendant and Facebook. The ""payload"" reflects data being transferred to Facebook. By looking at the ""payload,"" the Figure reveals~~we see~~ that the data Defendant is transferring to Facebook includes the video title for the ~~consumer's~~consumer's current video viewing session. In this illustration, the title is plainly spelled out twice as ""https://www.prageru.com/videos/do-women-belong-in combat"" and {""title"":" "Do Women Belong in Combat? | PragerU""}

13



*Figure 2*

37.    Defendant transfers to Facebook individual titles of prerecorded videos watched by users. While Figure 2 shows that Defendant is transferring individual titles to Facebook during viewing sessions, Figure 3 shows the cookies associated with each viewing session that are also being transferred to Facebook. The purpose of the cookie is to associate a specific person with the data being transferred (i.e., ~~the~~ session interactions and video titles) ~~being transferred~~. Figure 3 shows explicitly~~specifically~~ ~~shows~~ the cookies related to~~associated with~~ the session in Figure 2. As illustrated in Figure 3, each time the consumer watches a prerecorded video, Defendant ~~also~~ transfers to Facebook ~~with~~alongside the title of the prerecorded video material ~~to Facebook~~, a consumer's c_user cookie that is specifically designed to reflect the user's~~user's~~

14

1  Facebook ID.[2] As shown in ~~the~~ Figure 3, identifying the c_user is not tricky, requires

2  no technological training, and is not laborious~~difficult~~. It is shown plainly on the left-

3  hand side of the table labeled "~~"~~c_user."~~"~~ And the value is clearly shown on the right

4  side of c_user; in this illustration, it is 100069197062755, reflecting ~~plainly shown to~~

5  ~~the right side of the c_user, and in this illustration that value is 100069197062755—this~~

6  ~~value is~~ the user's~~user's~~ Facebook ID.

7


10  *Figure 3*

11      38.     None of the viewing data sent by Defendant to Facebook is encrypted in

12  any way, shape, or form.

13      39.     For each video request made by the user on Defendant's~~Defendant's~~

14  W~~w~~ebsite, Defendant transmits to Facebook the title of the video and the user's~~user's~~

15  Facebook ID.

16      ~~33.~~     After becoming subscribers to Defendant, and within the statute of

17  limitations period, the individual Plaintiffs had their ~~data~~PII trans~~ferred~~mitted or

18

_____

19  [2] The Facebook ID is stored in a small piece of code known as a "cookie" that Meta launches
    in the internet browsers of each Meta accountholder's device(s) to distinguish between
    website visitors. *See* Meta, *How to Create a Custom Audience from Your Customer List*, FACEBOOK

20  FOR BUSINESS, https://www.facebook.com/business/help/471978536642445?id=120537668283214
    2 (last visited Oct. 27, 2025)

otherwise disclosed in the same manner outlined and shown in Figures 1, 2 and 3. ~~how~~

~~Defendant sends to Facebook Plaintiffs and the Class Members PII along with the title~~

~~of the video watched by a consumer through the Website.~~

——

——

——

—— **[Intentionally Left Blank]**

——



—— *Figure 1. The image above is a screenshot of what a user sees when they attempt to*

*watch a video On Defendant's Website. The page does not contain any logos or indications that their*

*interactions are recorded and sent to Facebook.*

——

——



*Figure 2. The images above represent a screenshot of a network traffic report that was taken when a user attempts to watch a video from Defendant's Website, at which time the personal viewing information was transmitted to Facebook.*

40.

41. Upon information and belief, Defendant also transmits its ~~customers'~~ ~~customers'~~ consumers' Personal Viewing Information to Facebook and additional unauthorized third parties – including Google, TikTok, and Twitter – through other tracking technologies installed on its Website and Apps. The personally identifiable information disclosed by Defendant to these third parties includes email addresses used for account registration and other personal identifiers stored on their devices in the browser's cookies.

34.

~~35.~~42. The Personal Viewing Information that Defendant obtained from Plaintiffs

17

and the Class Members is valuable data in the digital advertising-related market for consumer information.

36.43. At no point did Plaintiffs or the Class Members consent to Defendant'sDefendant's disclosure of their video viewing history to third parties. As such, Defendant deprived Plaintiffs and the Class Members of their privacy rights and control over their personal information.

37.44. The harms described above are aggravated by Defendant'sDefendant's continued retention and commercial use of Plaintiffs'Plaintiffs' and the Class Members'Members' personal information, including their private video viewing histories.

## **CLASS ACTION ALLEGATIONS**

38.45. Plaintiffs bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, used Defendant'sDefendant's Website or Apps to view, purchase, or request prerecorded audio visual materials using their mobile or computer browsers.

39.46. The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge'sJudge's staff.

40.47. Plaintiffs reserve the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and

18

1  the specific theories of liability.

2      41.48. ***Community of Interest***: There is a well-defined community of interest

3  among members of the Class, and the disposition of the claims of these members of the

4  Class in a single action will provide substantial benefits to all parties and to the Court.

5      42.49. ***Numerosity***: While the exact number of members of the Class is unknown

6  to Plaintiffs at this time and can only be determined by appropriate discovery, upon

7  information and belief, members of the Class number in the millions. Members of the

8  Class may also be notified of the pendency of this action by mail and/or publication

9  through the distribution records of Defendant and third-party retailers and vendors.

10      43.50. ***Existence and predominance of common questions of law and fact***:

11  Common questions of law and fact exist as to all members of the Class and predominate

12  over any questions affecting only individuals of the Class. These common legal and

13  factual questions include, but are not limited to:

14      (a)    Whether Defendant collected Plaintiffs'~~Plaintiffs'~~ and the Class

15  Members'~~Members'~~ PII;

16      (b)    Whether Defendant unlawfully disclosed and continues to disclose its

17  users'~~users'~~ PII, including their video viewing records, in violation of the VPPA;

18      (c)    Whether Defendant's~~Defendant's~~ disclosures were committed knowingly;

19  and

20      (d)    Whether Defendant disclosed Plaintiffs'~~Plaintiffs'~~ and the Class

19

1   Members'~~Members'~~ PII without consent.

2   44.51. ***Typicality:*** Plaintiffs'~~Plaintiffs'~~ claims are typical of those of the Class

3   because Plaintiffs, like all members of the Class, requested and viewed audio visual

4   materials on Defendant's~~Defendant's~~ Website and had their PII collected and disclosed

5   by Defendant to third parties.

6   45.52. ***Adequacy***: Plaintiffs will fairly and adequately represent and protect the

7   interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).

8   Plaintiffs are adequate representatives of the Class because Plaintiffs have no interests

9   ~~which~~ that are adverse to the interests of the members of the Class. Plaintiffs are

10  committed to the vigorous prosecution of this action and, to that end, Plaintiffs have

11  retained skilled and experienced counsel.

12  46.53. Moreover, the proposed Class can be maintained because it satisfies both

13  Rule 23(a) and 23(b)(3) because questions of law or fact common to the Class

14  predominate over any questions affecting only individual members and a Class Action

15  is superior to all other available methods of the fair and efficient adjudication of the

16  claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

17  (a)    The expense and burden of individual litigation makes it economically

18  unfeasible for members of the Class to seek to redress their claims other than through

19  the procedure of a class action;

20  (b)    If separate actions were brought by individual members of the Class, the

1    resulting duplicity of lawsuits would cause members of the Class to seek to redress their

2    claims other than through the procedure of a class action; and

3        (c)     Absent a class action, Defendant likely will retain the benefits of its

4    wrongdoing, and there would be a failure of justice.

5 **CAUSES OF ACTION**

6 **COUNT I**
**Violation of the Video Privacy Protection Act**

7 **18 U.S.C. § 2710, *et seq.***

8      ~~47.~~54. Plaintiffs incorporate by reference each of the allegations contained in the

9    foregoing paragraphs of this Complaint as though fully set forth herein.

10      ~~48.~~55. The VPPA prohibits a ""video tape service provider"" from knowingly

11    disclosing ""personally-identifiable information"" concerning any ""consumer"" to a

12    third-party without the ""informed, written consent (including through an electronic

13    means using the Internet) of the consumer."" 18 U.S.C. § 2710.

14      ~~49.~~56. As defined in 18 U.S.C. § 2710(a)(4), a ""video tape service provider"" is

15    ""any person, engaged in the business, in or affecting interstate commerce, of rental,

16    sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."""

17    Defendant is a ""video tape service provider"" as defined in 18 U.S.C. § 2710(a)(4)

18    because it engaged in the business of delivering audiovisual materials—hundreds of

19    prerecorded videos on a wide array of topics—and those deliveries affect interstate or

20    foreign commerce.

21

50.57. As defined in 18 U.S.C. § 2710(a)(1), a ""consumer"" means ""any renter, purchaser, or subscriber of goods or services from a video tape service provider."" Plaintiffs and the Class Members are ""consumers"" because they:

    a. Created an account with Defendant by providing at a minimum, their first and last name, IP address, browser's stored cookies, and email address, then purchased, requested and/or viewed audio visual materials;

    b. Subscribed to Defendant'sDefendant's newsletter by providing at a minimum, their IPr ip address, browser's stored cookies, and email address, then requested and/or viewed audio visual materials; and/or

    c. Made a purchase Purchased from from Defendant'sDefendant's store through Defendant'sDefendant's Website.

51.58. Defendant knowingly caused Plaintiffs'Plaintiffs' and the Class Members'Members' Personal Viewing Information, as well as the above-referenced unique identifiers, to be disclosed to third parties, such as Facebook. This information constitutes ""personally identifiable information"" under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiffs and Class members to third parties as individuals who purchased or requested audiovisual materials from Defendant. This information allowed third parties, such as Facebook, to identify each PlaintiffPlaintiffs' and Class Member'sMember's specific video viewing preferences and habits.

52.59. As set forth in 18 U.S.C. § 2710(b)(2)(B), ""informed, written consent""

1  must be (1) ""in a form distinct and separate from any form setting forth other legal or

2  financial obligations of the consumer;"" and (2) ""at the election of the consumer…is

3  either given at the time the disclosure is sought or is given in advance for a set period

4  of time not to exceed two years or until consent is withdrawn by the consumer,

5  whichever is sooner."" Defendant failed to obtain informed, written consent from

6  Plaintiffs and the Class Members under this definition.

7       53.60. Defendant was aware that the disclosures to third parties that it shared

8  through the tracking software that it incorporated in its Website and Apps identified

9  Plaintiffs and the Class Members. Indeed, Facebook publicly touts its ability to connect

10  PII to individual user profiles. Defendant also knew that Plaintiffs'Plaintiffs' and the

11  Class Members'Members' Personal Viewing Information wereas disclosed to third

12  parties because Defendant programmed the tracking software into the

13  Website'sWebsite's and Apps'Apps' code so that third parties would receive the video

14  titles and consumer'sconsumer's unique third-party identifiers when a consumer

15  requested and/or purchased a videos or other prerecorded audio visual material on the

16  Website or Apps. The purpose of those trackers was to obtain identifiable analytics and

17  intelligence for Defendant about its user base, while also benefiting Facebook and other

18  third parties, by providing them with additional data that they can leverage for their

19  advertising, analytics, and/or other services.

20       54.61. Nor were Defendant'sDefendant's disclosures made in the ""ordinary

23

course of business"" as the VPPA defines the term~~the term is defined by the VPPA~~. In particular, the Website's~~Website's~~ and app's~~app's~~ disclosures to Facebook were not necessary for ""debt collection activities, order fulfillment, request processing, [or] transfer of ownership."" 18 U.S.C. § 2710(a)(2).

~~55.~~62. On behalf of Plaintiffs and the Class Members, Plaintiffs seek declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys'~~attorneys'~~ fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks~~s~~ judgment against Defendant as follows:

a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class, and Plaintiffs'~~Plaintiffs'~~ Counsel as Class Counsel;

b)    For an order declaring that Defendant's~~Defendant's~~ conduct violates each of the statutes referenced herein;

c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e)    For prejudgment interest on all amounts awarded;

f)    For an order of restitution and all other forms of equitable monetary relief;

g)    For injunctive relief as pleaded or as the Court may deem proper;

h)    For an order awarding Plaintiffs and the Class their reasonable attorneys'~~attorneys'~~ fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

24

1    Plaintiffs, individually and on behalf of members of the Class, demands a trial by

2    jury on all causes of action and issues so triable.

3    Dated: November 4, 2025~~October 31, 2025~~~~October 27, 2025~~~~October 8, 2025~~
     Respectfully submitted,

4

5                                         */s/ Frank S. Hedin*
                                          Frank S. Hedin

6                                         **HEDIN LLP**
                                          1395 Brickell Ave., Suite 610

7                                         Miami, Florida 33131-3302
                                          Telephone: (305) 357-2107

8                                         Facsimile: (305) 200-8801
                                          fhedin@hedinllp.com

9                                         **– and –**

10                                        Adrian Gucovschi
                                          Nathaniel Haim Sari

11                                        **Gucovschi ~~Rozenshteyn~~Law Firm, PLLC**
                                          140 Broadway, FL 46

12                                        New York, NY 10005
                                          Telephone: (212) 884-4230

13                                        adrian@~~gr firm~~ucovschilaw.com
                                          ~~nsari@gr~~

14                                        ~~firm.com~~nathaniel@gucovschilaw.com

15                                        *Counsel for Plaintiff and the Putative Class*

16

17

18

19

20

25